# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————————

Nº 10-CV-3311 (JFB) (ARL)

———————————————

## MARY LITCHHULT,

Plaintiff,

VERSUS

## USTRIVE2, INC.,

Defendant.

———————————

**MEMORANDUM AND ORDER**
July 10, 2013

———————————

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Mary Litchhult ("plaintiff" or "Litchhult") brings this action against defendant USTRIVE2, Inc. ("defendant" or "Ustrive2") alleging that defendant terminated her employment on April 24, 2009, in retaliation for her prior reporting of alleged gender discrimination or a hostile work environment. Additionally, plaintiff contends that defendant breached its employment agreement with plaintiff by (1) terminating her less than two years after she had started work, and (2) failing to provide her with employee stock options.

Defendant moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, raising the following arguments: (1) plaintiff cannot show a prima facie case of retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000, *et seq.* ("Title VII") and New York Executive Law §§ 296 *et seq.* ("New York State Human Rights Law" or "NYHRL"); (2) defendant's reasons for terminating plaintiff were nonretaliatory (attributable to a company-wide reduction in force) and were not pretextual; (3) plaintiff's first breach of contract claim fails because the express terms of the employment agreement clearly state that plaintiff's employment was to be "at will," and extrinsic evidence shows that plaintiff understood her employment to be terminable on such grounds; and (4) plaintiff's second breach of contract claim fails because uncontroverted evidence shows that defendant gave plaintiff the opportunity to exercise her stock options, which she declined.

For the reasons set forth herein, the Court grants defendant's motion for summary judgment in its entirety, concluding that the evidence in the record does not raise a triable issue of fact as to plaintiff's claims of retaliation or breach of

contract. Given the uncontroverted evidence in the record, no rational jury could find in plaintiff's favor in connection with either claim.

In particular, with respect to the retaliation claim, the uncontroverted evidence in the record – consisting of both sworn statements and documents – demonstrates that the decision to terminate plaintiff for budgetary reasons was made in March 2009, *prior* to her complaint concerning a PowerPoint slide shown at an April 8, 2009 meeting and an accompanying comment made by an independent contractor. Plaintiff has offered no evidence to the contrary. Moreover, defendant has articulated, and provided uncontroverted evidence of, a legitimate, non-discriminatory reason for terminating plaintiff's employment – namely, that the termination was part of what became a company-wide reduction-in-force that ended with UStrive2 filing for bankruptcy in October 2009, and then formally dissolving in early 2010. Indeed, no one was hired to replace plaintiff. Thus, even assuming *arguendo* that the decision to terminate plaintiff was made after the April 8, 2009 incident and that an inference of retaliation could be drawn from such temporal proximity, that inference alone is insufficient to overcome defendant's articulated, non-discriminatory reason or for a rational jury to find pretext. In short, plaintiff has offered absolutely no evidence from which a rational jury could find that defendant's articulated business reason for terminating plaintiff was a pretext for retaliation.

Plaintiff's breach of contract claim also cannot survive summary judgment. The employment agreement unambiguously states that it is an employment-at-will contract. Even if the Court were to conclude that the language of the agreement was ambiguous, all of the extrinsic evidence demonstrates that the parties intended for plaintiff's position to be terminable at will by either party at any time. Even construing the evidence most favorably to plaintiff, no rational jury could conclude otherwise. Similarly, although plaintiff contends that defendant breached the agreement by failing to provide her with stock options, the uncontroverted evidence shows that plaintiff was awarded all stock options to which she was entitled under the employment agreement, but that she elected not to exercise the options; accordingly, the options were cancelled on account of her failure to exercise the options within the requisite 90-day period following her termination.

I.     BACKGROUND

A.     Facts

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 Statements of Facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Unless otherwise noted, where a party's 56.1 Statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.[1]

---

[1] Although defendant's Rule 56.1 Statement contains specific citations to the record, the Court cites to the Rule 56.1 Statement instead of to the underlying citation to the record.

The Court notes that plaintiff also submitted a Rule 56.1 Statement in which she admits the majority of the statements contained in defendant's 56.1 Statement. Where plaintiff denies a statement, however, she offers no admissible evidence to support her blanket assertion. Where "the opposing party [] fails to controvert a fact so set forth in the []

### 1. Employment at Protocol

Prior to her employment at Ustrive2, plaintiff worked at Protocol Technologies ("Protocol") from 2003 until approximately April/May 2008. (Def.'s 56.1 Statement ("Def.'s 56.1") ¶ 7.) Protocol was an on-demand media company specializing in a business that has since become obsolete, namely, burning software onto CDs and movies and television programs onto DVDs. (*Id.* ¶¶ 7-9.) Plaintiff held an at will position at Protocol. (*Id.* ¶ 12.) As the company's financials worsened, she decided to break with Protocol and resigned voluntarily. (*Id.* ¶ 11.)

---

Rule 56.1 statement, that fact will be deemed admitted." *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (citing Local Rule 56.1(c)); *see also MetroPCS N.Y., LLC v. Vill. of E. Hills*, 764 F. Supp. 2d 441, 444 (E.D.N.Y. 2011). Further, plaintiff's counterstatements, stating that she "can neither admit nor deny" defendant's statement (*see* Pl.'s 56.1 Statement ("Pl.'s 56.1") ¶ 5), or that she "does not know that for a fact" (*id.* ¶¶ 105-07), serve as admissions to the corresponding facts in defendant's 56.1 Statement under applicable law. *See Aztar Corp. v. NY Entm't LLC*, 15 F. Supp. 2d 252, 254 n.1 (E.D.N.Y. 1998) (stating that defendant's "56.1 Statement is replete with responses of lack knowledge or information sufficient to either admit or deny, [which does] not create[] any issues of fact," and noting that "[u]nder Local Rule 56.1, [a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the [counter 56.1] statement" (citation and internal quotation marks omitted)); *see also Alfano v. NGHT, Inc.*, 623 F. Supp. 2d 355, 363 (E.D.N.Y. 2009) ("[P]laintiff frequently 'denies knowledge or information sufficient to form a belief as to the truth or falsity of defendants' statement of fact . . ., which is not sufficient to create an issue of fact for Rule 56 purposes."). In any event, because plaintiff is *pro se*, the Court has examined the record carefully and deems as admitted only those facts in defendant's Rule 56.1 Statement that are supported by admissible evidence and that are not controverted by other admissible evidence in the record.

### 2. Offer and Acceptance

Plaintiff began her search for new employment, focusing on positions in the on-demand industry so that she could work remotely from home. (*Id.* ¶ 15.) When plaintiff first learned of Ustrive2, she understood it to be an e-commerce company that would, described most simply, set up virtual shops from which people could sell their goods online. (*Id.* ¶ 16.) Plaintiff decided to inquire about positions at Ustrive2, which was branching out to on-demand media. (*Id.* ¶ 17.) Plaintiff first began communicating with Ustrive2 about possible employment in late August or early September of 2008, speaking with Harlan Lyons ("Lyons"), Ustrive2's then-Chief Executive Officer ("CEO"). (*Id.* ¶ 18.) Following several phone conversations, Lyons sent plaintiff a proposed employment agreement. (*Id.* ¶ 21.) The relevant facts concerning the finalization of plaintiff's employment agreement with Ustrive2 are as follows.

At some time during plaintiff and Lyons' conversations regarding the terms of plaintiff's employment, plaintiff wrote on the first page of the received draft employment agreement the phrase, "employment at will state → AZ & NY," which plaintiff understood to mean "[t]hat Arizona and New York are employment at will states." (*Id.* ¶ 22 (citing Def.'s Mot. for Summ. J. Ex. B, Pl.'s Dep. at 155:23 – 156:10, 168:3 – 170:8; 379:10-17).) Plaintiff also wrote on the first page of the draft agreement the phrase, "2 yr term." (*Id.* ¶ 25.) Contained in the draft agreement was a proposed "Term," stating "two years – employment at will by Ustrive2 Inc." (*Id.* ¶ 26.) At her deposition, plaintiff testified that she understood this phrase to mean that she was free to leave her employment at any time and for any reason during the two-year time period. (*Id.* ¶ 28 (citing Def.'s Mot. for

Summ. J. Ex. B, Pl. Dep. at 177:24–178:8, 340:3–341:5, 341:10-23, 344:20–345:11).) Additionally, plaintiff asked Lyons to remove the two year time restriction from the language, "two years – employment at will by Ustrive2 Inc." because she feared that the "two year" language might serve as a type of non-compete provision, limiting her ability to find another job should she be released from Ustrive2. (*Id.* ¶¶ 27-29.)

In fact, the draft agreement did contain a non-compete provision, with which plaintiff also took issue. (*See id.* ¶¶ 29-31.) The provision states "that you will not compete directly or indirectly with Ustrive2 in any similar business for period of two years following your departure from Ustrive2 for any reason." (*Id.* ¶ 30.) The uncontroverted evidence shows that plaintiff wanted this provision removed from the draft agreement because she was concerned that it did not allow for her to receive any compensation during the period of non-competition immediately following a termination of her employment. (*Id.* ¶¶ 31-32.)

On September 30, 2008, plaintiff accepted Ustrive2's offer of employment, formally executing Lyons' revised offer letter. (*See id.* ¶ 35.) Plaintiff's fully-executed acceptance of employment contains no material changes from the draft agreement, with the exception of two elements: (1) a change in plaintiff's job position (from "Director of Business Development" to "Vice President Multimedia Distribution"); and (2) a removal of the non-compete provision. (*Id.* ¶ 36.) At her deposition, plaintiff confirmed that she understood the striking of the non-compete agreement to mean that she could have left Ustrive2 for a better job opportunity had one arisen. (*Id.* ¶ 37.) Notably, the Term "two years – employment at will by Ustrive2 Inc." language remained untouched in the final agreement. (*Id.* ¶ 39.)

On September 15, 2008, plaintiff began her employment at Ustrive2 in the position of Vice President. (*Id.* ¶ 41.)

3. Employment at Ustrive2

Plaintiff was employed at Ustrive2 from September 15, 2008 to April 24, 2009. (*Id.* ¶ 45.) The Company was composed of several divisions, one of which is of particular relevance here and entitled, RightNOW. (*Id.* ¶ 52.) Plaintiff was a member of this division during her period of employment. She (along with other members of that group) focused on acquiring clients in the on-demand video business industry. (*Id.* ¶¶ 45-46.) In particular, plaintiff "engag[ed] content owners to participate in the DVD on-demand system," "[e]ngag[ed] retailers to participate in the DVD on-demand system," and "[e]ngag[ed] . . . backend users to utilize the DVD on-demand system." (*Id.* ¶ 47.)

4. Ustrive2's Financial Problems

In March 2009, Ustrive2 consisted mainly of three divisions, one of which was RightNOW. (*Id.* ¶ 52.) However, by March 2009, Ustrive2 had not produced significant revenue in any of the markets it served, and further, had difficulty obtaining funding from investors. (*Id.* ¶¶ 53-54.) Around that same time, Ustrive2's CEO Lyons left the Company and was replaced by Jeff Kukowski ("Kukowski"), who served as the Company's interim CEO. (*Id.* ¶ 55.)

On reviewing the Company's financials, Kukowski faced the hard numbers: he discovered that Ustrive2 had "burned through" approximately two million dollars in funds that had been provided by investor.[2]

_____

[2] In her deposition testimony, plaintiff admitted that Ustrive2 was experiencing financial problems in

(*Id.* ¶ 57.) Additionally, Kukowski learned more about RightNOW's business model, concluding that it was not a profitable one for the Company. (*Id.* ¶ 62.) In particular, he learned that most companies in the on-demand media industry (like RightNOW) invested hundreds of millions of dollars before exiting the market due to insufficient revenues and returns; he also learned that before Ustrive2 acquired RightNOW, its previous owner had raised and spent nearly forty million dollars while only generating approximately two million dollars during the course of several years. (*Id.*) On discovering that Ustrive2 would have to invest millions into RightNOW, with the promise of little to no return, Kukowski became increasingly unconvinced as to RightNOW's overall benefit to the Company, especially given that the division had failed to generate any revenue in its first six months of time at the company. (*Id.* ¶¶ 62-64.) In light of Ustrive2's struggling financial condition, as well as RightNOW's limited-to-no profitability, Kukowski decided to stop investing the Company's already constrained financials into RightNOW. (*Id.* ¶ 67.) With this decision made, Kukowski turned to an even more difficult determination: whom to lay off. (*Id.*)

Lay-off decisions were made by a group of individuals, including Kukowski, Josh Manley ("Manley") (Ustrive2's Co-Founder and President), Melinda Urion ("Urion"), and Maria Utagawa ("Utagawa"), the latter of whom served as a Human Resources ("HR") Consultant during the process. (*Id.* ¶ 70.) On March 15, 2009, Urion created an Excel spreadsheet that identified, among other things, Ustrive2's employees and their "Current Burn," *i.e.*, those employees'

relation to how quickly Ustrive2 went through its money. (*Id.* ¶ 75.) Urion presented the Current Burn Chart at a meeting held on March 15, 2009, at which time Urion, Manley, and Kukowski agreed that certain identified members of RightNOW had to be terminated. (*Id.* ¶¶ 77-79.)

### 5. Terminations

Following Kukowski, Manley, and Urion's March 18, 2009 determinations, RightNOW members Jennifer Martinez ("Martinez") and Eric Cox ("Cox") were selected for termination in March 2009 in the hopes that Ustrive2's burn rate (*i.e.*, the rate at which the Company went through money) could be diminished by taking Martinez and Cox's respective salaries out of the equation. (*Id.* ¶¶ 72, 76, 79.) Accordingly, Cox and Martinez were terminated, their respective positions in the RightNOW division were eliminated, and the Company did not hire replacements for them. (*Id.* ¶¶ 81, 84.)

Although the decision to terminate both Martinez and Cox was made in March 2009, Cox's termination did not become effective until April 17, 2009, and Martinez's, not until May 18, 2009. (*Id.*) This point is relevant because Martinez submitted an internal complaint concerning an April 8, 2009 tech team meeting, at which time comments were made during a slideshow presentation (discussed in greater detail *infra*) that offended her. (*Id.* ¶ 87.) Thus, plaintiff contends that Martinez, like plaintiff, was terminated because of her complaint. The final decision to terminate Martinez, however, had been made as of March 2009, before Martinez had submitted

---

2009, and noted that various employees were being laid off or reduced to part-time status at that time. (Def.'s 56.1 ¶¶ 68-69.)

her complaint. (*Id.*)[3] In fact, Manley and Kukowski already had notified Aaron Knoll, RightNOW's founder, of the decision to terminate Cox and Martinez before the time of the April 8, 2009 meeting. (*Id.* ¶ 91.)

The termination of Cox and Martinez, however, was not enough. Additional cuts were necessary. Thus, the Company made further lay-off decisions, this time designating RightNOW members Syd Dufton ("Dufton") and plaintiff for termination. (*Id.* ¶ 92.) Plaintiff and Dufton were identified for termination at a meeting held on March 23, 2009, at which time Manley and Kukowski agreed to speak with Knoll about eliminating plaintiff and Dufton from the employment roster. (*Id.* ¶¶ 94-95.) Ultimately, the final decision to terminate plaintiff was made on April 13, 2009, with her termination becoming effective April 24, 2009. (*Id.* ¶ 100.) Dufton was similarly terminated, with the final decision being made on April 13, 2009, and his termination becoming effective May 8, 2009. (*Id.* ¶ 98.) As with Cox and Martinez, Dufton and plaintiff's job titles were eliminated, and no replacements were hired. (*Id.* ¶¶ 98-99.)

Plaintiff, like Martinez, also had submitted an internal complaint regarding a meeting that took place on April 8, 2009. (*Id.* ¶¶ 103-04.) As the above facts indicate, the April 8 meeting occurred *after* Ustrive2's identification of plaintiff for termination (March 23), but *before* her actual formal lay-off (April 24). It is this meeting which plaintiff contends indicates Ustrive2's retaliation against plaintiff because she was terminated approximately sixteen days after the April 8, 2009 meeting. (*See id.*) Defendant contends, however, that at the time of the April 13, 2009 meeting, when the final decision to terminate plaintiff was made, the decisionmakers were unaware of either plaintiff or Martinez's respective complaints regarding the April 8, 2009 meeting. (*See id.* ¶ 105.) As this meeting is the main source of contention between the parties, the Court sketches the relevant details as to what took place.

### 6. The April 8, 2009 Meeting

The April 8, 2009 meeting was a tech team meeting that was attended in-person, at Ustrive2's Arizona offices, and by conference call for remote employees, including Martinez and plaintiff. (*Id.* ¶ 110.) The meeting featured a PowerPoint slide presentation that, due to time constraints, had not been reviewed or approved in advance by the higher-ups at Ustrive2, including then-Chief Technology Officer Dave Pulver ("Pulver"). (*Id.*) One of the slides defined the technical term, "Sprint," as follows: "Engineering's menstrual cycle." (*Id.*; *see also* Def.'s Mot. for Summ. J. Ex. L.) Further, while presenting the slideshow, the presenter, Dan Milliron ("Milliron"), made the corresponding comment that "Sprint is a 30-day cycle with five days of anger days in the middle." (Def.'s 56.1 ¶ 110.) Needless to say, not all participants approved of the slide or Milliron's language. In fact, plaintiff stopped the meeting in order to express her disapproval of both the slide's content and Milliron's corresponding commentary. (*Id.*)

Both plaintiff and Martinez submitted complaints concerning the slide show presentation, which HR Consultant Utagawa turned to for investigation and resolution

---

[3] In its Rule 56.1 Statement, defendant explains the reasons behind the time gap in Martinez's effective termination: (1) because Martinez lived and worked in Canada, and the Company wanted to ensure her termination was in compliance with British Columbian employment law, and (2) Martinez was responsible for projects falling outside the RightNOW division, which needed to be completed before her exit. (Def.'s 56.1 ¶ 86.)

that same day. (*Id.* ¶¶ 108-10.) On speaking with Pulver, he acknowledged that both the slide and Milliron's use of terminology reflected poor judgment, and he confirmed that Milliron had taken the appropriate steps to apologize. (*Id.* ¶ 111.) Pulver assured Utagawa that he would follow up with Milliron in order to ensure that such conduct did not repeat itself in the future. (*Id.*) The slide with the offending language also was removed from the PowerPoint presentation, with a replacement slide issued and created for distribution. (*Id.*)

Ultimately, Utagawa concluded that the inappropriate conduct concerning the slide was an isolated incident, and that it was not intentionally targeted at anyone. (*Id.* ¶ 112.) At deposition, plaintiff testified that she did not contact Utagawa again regarding the incident, and that she did not hear of another presentation of that or a similar nature taking place again. (*Id.* ¶¶ 114-16.)

7.  The End of Ustrive2's Endeavors

Additional RightNow team members were terminated following plaintiff's departure, and Knoll, RightNOW's founder, received a significant salary reduction, culminating in a change of position to that of independent contractor responsible for assisting in the winding down of the company's business. (*Id.* ¶¶ 117, 119.) Knoll's prior position in RightNOW was eliminated, and no replacement was hired. (*Id.* ¶ 117.) Additional Ustrive2 employees were affected, with some receiving reduced salaries, and others being terminated. (*Id.* ¶ 120.) In essence, Ustrive2 performed a systematic reduction-in-force in the hopes of salvaging the Company. (*See id.* ¶¶ 117-127.) Indeed, even Kukowski, the interim CEO, did not escape the broad sweep of the termination sheath. (*See id.* ¶ 128.)

Ustrive2 eventually filed for Chapter 11 bankruptcy on October 16, 2009 in the United States Bankruptcy Court for the District of Arizona. (*Id.* ¶ 127.) On January 19, 2010, Ustrive2's Board of Directors approved a dissolution of the corporation, with Ustrive2's officers and shareholders agreeing to the same on February 15, 2010. (*Id.* ¶¶ 129-30.) Ustrive2's endeavors ended in or about March 2010, when the company's dissolution officially took effect. (*Id.* ¶ 130.)

8.  Opting Against Stock Options

Plaintiff's employment agreement with Ustrive2 indicated that she would be "eligible to receive 25,000 shares of three-year vesting employee incentive stock options, after the initial 90-day transition period," and "eligible to receive an additional 25,000 shares of three-year vesting employee incentive stock options, after one complete year of service," with "[t]he [specific] number of options [to] be released [based] on [plaintiff meeting] milestone objectives." (*Id.* ¶ 132 (quoting Def.'s Mot. for Summ. J. Ex. D).) Plaintiff was terminated before completing one year of service at Ustrive2. (*Id.* ¶ 135.) Accordingly, she was only entitled to a maximum of "25,000 shares of three-year vesting employee incentive stock options, after the initial 90-day transition period." (*Id.* ¶ 135.) Plaintiff was advised of this fact on March 31, 2009, via email correspondence with Urion. (*Id.* ¶ 135 (citing Def.'s Mot. for Summ. J. Ex. I, Urion's Mar. Email Exchange with Pl. re Stock Options).) Further notices followed.

On April 15, 2009, Manley, by letter, notified plaintiff that Ustrive2's Board of Directors had awarded her stock options. (*Id.* ¶ 136.) On April 24, 2009, Utagawa, by email, informed plaintiff that Ustrive2 would provide her with an accelerated

vesting of her stock options in consideration for her signing of the separation and release agreement. (*Id.* ¶ 137.) On May 19, 2009, plaintiff received an additional reminder about her options – Manley sent plaintiff a letter notifying her that she had 90 days from the effective date of her termination (April 24, 2009) to exercise her vested stock amounts. (*Id.* ¶ 138.) Plaintiff's options vested, but she never exercised them; thus, the options were canceled. (*Id.* ¶ 140.)

## B.     Procedural History

On September 28, 2009, plaintiff filed a claim of gender discrimination and retaliation against Ustrive2 with the Equal Employment Opportunity Commission ("EEOC"). On April 19, 2010, the EEOC issued to plaintiff a right-to-sue letter; plaintiff took note and, on July 20, 2010, commenced the instant action by filing the complaint.

On October 18, 2010, defendant filed a motion to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff submitted her opposition on November 17, 2010, and defendant filed its reply on November 29, 2010. On September 1, 2011, the Court granted defendant's partial motion to dismiss plaintiff's complaint in its entirety, effectively dismissing the following: (1) plaintiff's Title VII and NYHRL hostile work environment claims, and (2) plaintiff's state common law claims of fraudulent misrepresentation and fraudulent inducement, breach of covenant of good faith and fair dealing, and intentional infliction of emotional distress. Thereafter, plaintiff filed her amended complaint on November 16, 2011, which defendants answered on December 1, 2011. Defendants sought leave to file a motion for summary judgment from the Court, which the Court granted, setting forth a corresponding

briefing schedule. Defendant subsequently requested extensions of time in which to file its summary judgment motion, each of which the Court granted. On December 24, 2012, defendant filed its motion for summary judgment. Plaintiff filed her opposition motion (dated January 25, 2013) on February 7, 2013. Defendant submitted its reply on February 8, 2013. This matter is fully submitted and the Court has considered all of the parties' submissions.

## II.     STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the burden of showing that he or she is entitled to summary judgment." *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004)

(quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (alteration in original). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 24. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33) (internal quotation mark omitted).

## III. DISCUSSION

### A. Retaliation Claim

#### 1. Legal Standard[4]

Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). The Court evaluates a Title VII retaliation claim under the three-step, burden-shifting framework used for an adverse employment claim, as established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[5] First, a plaintiff must

[4] Subsequent to briefing in this case, the Supreme Court modified the standard for employment discrimination claims in *University of Texas Southwestern Med. Ctr. v. Nassar*, No. 12-484, 2013 WL 3155234 (June 24, 2013). In this decision, the Supreme Court set forth a higher standard for plaintiffs seeking to establish a retaliation claim under Title VII. Specifically, the Court held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in §2000e-2(m)" of Title VII. *Nassar*, 2013 WL 315523, at *14. "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*

As *Nassar* had not been decided at the time of the parties' briefing, the underlying arguments were not assessed under the Supreme Court's stricter standard. Given that the Court concludes that plaintiff's retaliation claim fails under the former – and lower – causation test, the Court need not decide whether plaintiff's claim could have survived the Supreme Court's newer – and higher – but-for causation test. In other words, as discussed *infra*, the Court concludes that no rational jury could conclude that plaintiff's protected activity was a cause for her termination, no less a but-for cause.

[5] "[R]etaliation claims brought under the NYSHRL are evaluated identically to claims brought under Title VII." *Maher v. Alliance Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 259 (E.D.N.Y. 2009). For this reason, the Court's analysis as to plaintiff's federal

establish a prima facie case of retaliation by demonstrating that "(1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination. *See* 42 U.S.C. § 2000e-3; *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). Informal as well as formal complaints constitute protected activity. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). Title VII protects not only those employees who opposed employment practices made unlawful by the statute, but also those who have a "'good faith, reasonable belief that the underlying challenged actions of the employer violated the law,'" even if those actions did not. *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001) (quoting *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999)). In determining whether a plaintiff has satisfied this initial burden, the court's role in evaluating a summary judgment request is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action; if the employer carries that burden, it shifts back to plaintiff to demonstrate by competent evidence that the reasons proffered by defendant were pretext for retaliatory animus based upon the protected Title VII activity. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

The Supreme Court has defined an "adverse employment action" in the Title VII retaliation context (distinct from and broader than the standard in the Title VII discrimination context) to mean an action that is "materially adverse" and that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citations omitted). In particular, "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id*. at 69.

2.    Application

The Court need not address whether plaintiff can establish the first three prongs of her prima facie case because, on review of the uncontroverted evidence, it is clear that plaintiff cannot satisfy the fourth prong. That is, plaintiff cannot show a causal connection between her protected activity – *i.e.*, her complaint about the slide incident – and any adverse action.

A causal connection may be established "(a) indirectly by showing that the protected activity was followed closely by discriminatory treatment; (b) indirectly through other evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (c) directly through evidence of retaliatory animus." *Martinez v. N.Y.C. Dep't of Educ.*, No. 04-Civ-2728 (DFE), 2008 WL 2220638, at *12 (S.D.N.Y. May 27, 2008) (citation and internal quotation marks omitted); *see also Cook v. CBS, Inc.*, 47 F. App'x 594, 596 (2d Cir.

<hr>

law retaliation claims will also apply to plaintiff's state law retaliation claim.

2002); *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987). Even construing the record in plaintiff's favor, as the Court must, plaintiff cannot show any of the three bases for establishing a causal connection. The Court addresses each in turn.

To begin with, plaintiff cannot show that her alleged protected activity of submitting a complaint was closely followed by discriminatory treatment. Plaintiff's essential argument is that, because her termination occurred approximately sixteen days after the April 8, 2009 slide-incident meeting, which she complained about that same day, her retaliation claim should go forward. (*See* (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 3; *see also* Def.'s 56.1 ¶ 103 (citing Def.'s Mot. for Summ. J. Ex. B, Pl. Dep. at 193:5 – 196:4).) However, case law is clear that where "'timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Chamberlin v. Principi*, 247 F. App'x 251, 254 (2d Cir. 2007) (quoting *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).

Here, the uncontroverted evidence in the record shows that, although plaintiff first learned of her termination in April 2009, the decision to terminate her already had been set in motion as of March 23, 2009; it was simply finalized during the April 13, 2009 meeting. (*See* Def.'s 56.1 ¶¶ 92-101.) Thus, the alleged adverse job reaction (*i.e.*, plaintiff's termination) "began well before [] plaintiff had [] engaged in any protected activity," thereby removing any possible inference of retaliation. *Chamberlin*, 247 F. App'x at 254; *see also Zboray v. Wal-Mart Stores E., L.P.*, 650 F. Supp. 2d 174, 182 (D. Conn. 2009) (finding temporal proximity

insufficient for establishing indirect causation because adverse actions began before plaintiff engaged in protected activity).

Plaintiff counters that the documents to which defendant directs the Court's attention, allegedly showing that plaintiff already had been targeted for termination before the slide incident took place, are not persuasive because there is no specific reference to terminating plaintiff. (Pl.'s Opp'n at 3). However, plaintiff's argument overlooks a whole series of uncontroverted facts in the record. First, it is uncontroverted – both in the sworn statements and documentation submitted by defendant – that in March 2009, the decision to terminate individuals on the RightNOW team for financial reasons had already been made, and that Company officials were in the process of identifying individuals for termination. In fact, plaintiff's own personal notebook for the period February 17 to April 24, 2009 contains entries, prior to the April 8 meeting, that make abundantly clear that she was aware that the Company was terminating people to reduce costs. For example, an April 7, 2009 entry in plaintiff's notebook states, *inter alia*: "[W]ant burn rate below $150K per month. They're looking at everyone – need to justify everyone's existence – Eric [Cox] – Jenny [Martinez] – Kurt [Collins] going to P/T." (Def.'s Mot. for Summ. J. Ex. J.)

Second, although plaintiff claims that Jennifer Martinez was terminated (like plaintiff) because she complained about the PowerPoint slide, the documentation unequivocally shows that the decision to terminate Martinez was made in March 2009, prior to the April 8 slideshow. For example, there is an Excel Spreadsheet created on March 15, 2009, which designated Martinez and another employee (Eric Cox) with a "Current Burn" of $0.00

because they already had been targeted for termination at that time. (*See* Def.'s Mot. for Summ. J. Ex. G.) Similarly, there is an email on April 8, 2009, prior to the meeting with the PowerPoint slide, and before plaintiff or Martinez had submitted their complaints, in which the decision to terminate Martinez is referenced. (*See* Def.'s Mot. for Summ. J. Ex. K.) In fact, plaintiff's personal notebook contains reference, prior to the April 8, 2009 meeting, to the termination decision regarding Martinez. (*See* Def.'s Mot. for Summ. J. Ex. J.) Third, plaintiff has no evidence to controvert the sworn statements from multiple individuals that the decision was made to eliminate plaintiff's position (along with Dufton's position) on March 23, 2009. In short, the only evidence in the record shows that the decision to terminate plaintiff was made on March 23, 2009 (pre-PowerPoint), but was not announced until mid-April 2009 (post-PowerPoint). Thus, there is no inference of retaliation based on temporal proximity.[6]

Second, plaintiff cannot show a causal connection indirectly by pointing to "other evidence such as disparate treatment of fellow employees who engaged in similar conduct." *DeCintio*, 821 F.2d at 115. It is true that co-worker Martinez also submitted a complaint concerning the slide incident, and also was terminated in the same timeframe as plaintiff. (*See* Def.'s 56.1 ¶¶ 76-91.) However, this uncontroverted evidence is insufficient for purposes of establishing a causal connection because, as

with plaintiff, the record reflects that the decision to terminate Martinez occurred *before* the April 8, 2009 meeting (specifically, on March 18, 2009 (*see id.* ¶¶ 72, 76, 79)), and therefore, *before* any submission of a complaint on Martinez's (or even plaintiff's) part. For this reason, no causal connection is shown under this ground, either.

Third, plaintiff cannot demonstrate a causal connection directly through evidence of retaliatory animus. *See DeCintio*, 821 F.2d at 115. Plaintiff testified that after her submission of the slide-incident complaint, she never heard of Milliron making a presentation of that kind ever again. (*See* Def.'s 56.1 ¶ 115 (citing Def.'s Mot. for Summ. J. Ex. B, Pl. Dep. at 249:3-23).) Further, the record shows that, following plaintiff and Martinez's respective complaints, Utagawa promptly contacted Pulver, Milliron's supervisor, about the incident and advised him to keep the company informed if anyone were to perform the same or similar conduct again. (Def.'s 56.1 ¶ 111.) The uncontroverted evidence also shows that the offensive slide was removed from the PowerPoint presentation and replaced with a non-offensive-language slide. (*Id.*) Thus, the uncontroverted evidence is that plaintiff and Martinez's complaints were taken heed of, and that the matter was properly handled by the Company. Moreover, plaintiff does not allege that Kukowski, Manley, Urion, Utagawa, or any of the other higher ups at Ustrive2 engaged in any actions, outside of plaintiff's termination, that could be viewed as reflective of retaliatory animus. (*See id.* ¶ 116; Def.'s Mot. for Summ. J. Ex. B, P. Dep at 244:10-245:8. *See generally* Am. Compl.)

Additionally, plaintiff made certain concessions during her deposition that undermine her argument that Ustrive2's

---

[6] As discussed *infra*, even if temporal proximity could be established, the claim would still fail because plaintiff has no other evidence to challenge defendant's articulated, non-discriminatory reason for the termination – namely, a systematic reduction-in-force that began with the RightNow team, and then spread company-wide until Ustrive2 filed for bankruptcy in October 2009 and subsequently dissolved in March 2010.

reasons for terminating plaintiff were motivated by a discriminatory animus. For instance, plaintiff testified that the on-demand media industry, in which she previously had worked at Protocol and which she focused on developing at Ustrive2, was a model that both originated and became defunct in the course of a ten year or so period, and which was well on the decline at the time of plaintiff's termination. (*See* Def.'s 56.1 ¶ 9; *see also* Def.'s Mot. for Summ. J. Ex. B, Pl. Dep. at 86:13-24.) Plaintiff also acknowledged that as of 2009, Ustrive2 was experiencing financial troubles and that various employees, not just plaintiff, were being laid-off or reduced to a part-time status. (Def.'s 56.1 ¶¶ 68-69 (citing Def.'s Mot. for Summ. J. Ex. B, Pl. Dep., at 399:22 – 400:6, 404:14 – 405:24, 421:12 – 428:18).) Further, plaintiff admitted that she was not a part of any of the discussions with the decision-making authorities at Ustrive2 regarding potential terminations, nor did she have any knowledge of Ustrive2's plans regarding RightNOW or its other divisions. (*Id.* ¶ 73 (citing Def.'s Mot. for Summ. J. Ex. B, Pl. Dep. 201:14 – 202:3, 250:2-23).)

In sum, plaintiff conceded that Ustrive2 was financially unstable around the time of her (and others') termination, that she was not privy to the discussions during which the financial future of Ustrive2 (as well as that of its employees) was debated, and therefore, had no knowledge surrounding the circumstances of the near company-wide layoffs, that the industry in which she specialized was well on its way to becoming obsolete at the time of her termination, and that she was not the only individual whom Ustrive2 terminated at the time of her lay-off. Moreover, the uncontroverted evidence shows that discussions already were underway regarding plaintiff's and Martinez's respective terminations – part and parcel of a company-wide reduction-in-

force – prior to the April 8, 2009 slide incident and subsequent complaint. (*See* Def.'s 56.1 ¶¶ 52-107, 117-130.)

In short, plaintiff cannot establish a causal connection, whether directly or indirectly, between her protected activity of submitting a complaint concerning the slide incident and the alleged retaliatory act of her subsequent termination.

Even if plaintiff could establish such causality, however, her retaliation claim still fails because defendant has established a legitimate, nondiscriminatory reason for terminating plaintiff. In other words, plaintiff cannot show that the decision to terminate her was pretextual. As discussed *infra*, the uncontroverted evidence establishes that plaintiff was an at-will employee at Ustrive2. As such, she could have been terminated for any reason or for no reason at all, provided that such termination was not based on discrimination. *See Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1987) (stating that an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason"). Moreover, courts have recognized that an employer's general reduction in workforce may be a factor supporting a legitimate, non-discriminatory reason for an employee's termination. *See, e.g., Maresco v. Evans Chemetics*, 964 F.2d 106, 111 (2d Cir. 1992) (noting that a "reduction-in-force and reorganization of staff constitutes a legitimate nondiscriminatory reason for employment related decisions" (internal citation and quotation marks omitted)); *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 591 (S.D.N.Y. 2012) (concluding that defendants had provided a legitimate, non-discriminatory reason for plaintiff's termination where evidence showed that

employer terminated plaintiff "not because of factors particular to her, but as part of a broader workforce reduction caused by budgetary constraints which resulted in the elimination of the entire . . . group, of which [plaintiff] was a part"). Because the uncontroverted evidence in the record reveals a legitimate, nondiscriminatory reason for plaintiff's termination, and because the record does not support the conclusion that the employer's decision was pretextual, the Court concludes that, even if plaintiff could establish temporal proximity, her retaliation claim still must fail. *See Moccio*, 889 F. Supp. 2d at 539 (granting motion for summary judgment on plaintiff's retaliation claim where evidence in record showed that plaintiff's termination was part of a workforce reduction, and further, that employer had considered layoffs within plaintiff's department group before plaintiff engaged in protected activity).

Here, although plaintiff claims she can demonstrate temporal proximity, she also concedes that she has no other evidence of retaliation. (*See* Def's Mot. for Summ. J. Ex. B, Pl. Dep. at 195:23-96:4 ("Q. Is there anything other than the fact that your termination came sixteen days after that meeting and any complaint that you may have made about that meeting, that serves as the basis for that [retaliation] claim? A. No.").) Thus, even if plaintiff could establish temporal proximity, her claim cannot survive summary judgment because temporal proximity alone is insufficient to overcome a non-discriminatory reason and raise a triable issue of fact on pretext. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (per curiam) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation . . . , but without more, such temporal proximity is insufficient to satisfy [a plaintiff's] burden to bring forward some

evidence of pretext. . . . ."); *accord Simpson v. N.Y. State Dep't of Civil Servs.*, 166 F. App'x 499, 502 (2d Cir. 2006) (same). "'Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact.'" *Mavrommatis v. Carey Limousine Westchester, Inc.*, 476 F. App'x 462, 466 (2d Cir. 2011) (quoting *El Sayed*, 627 F.3d at 933). Here, plaintiff does not even claim to have any evidence, beyond purported temporal proximity, in support of plaintiff's claim that the proffered reason for her termination was pretextual. Thus, the retaliation claim cannot survive summary judgment.

\*       \*       \*

In sum, the Court grants summary judgment to defendant because the uncontroverted evidence shows that plaintiff cannot state a prima facie retaliation claim, and that, even if she could, there is no evidence from which a rational jury could conclude that defendant's reason for terminating plaintiff was a pretext for retaliation.

B.       Breach of Contract Claims[7]

Plaintiff next raises two breach of contract claims, asserting that defendant breached the terms of its contractual agreement with plaintiff when it (1) terminated her before she had completed two years with the company, and (2) failed to provide her with employee stock options. (*See* Am. Compl. ¶¶ 50, 54, 57, 60.) The Court addresses each claim in turn, first setting forth the applicable law.

_____

[7] The Court notes that, although the federal claim cannot survive summary judgment, the Court also addresses the state law claims because there is diversity of citizenship jurisdiction.

### 1. Legal Standard

To establish a breach of contract claim under New York law, a party must show "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." *Kapsis v. Am. Home Mortg. Servicing Inc.*, No. 11-CV-4936(JFB)(AKT), 2013 WL 544010, at *18 (E.D.N.Y. Feb. 14, 2013) (quoting *Kramer v. N.Y.C. Bd. of Educ.*, 715 F. Supp. 2d 335, 356 (E.D.N.Y. 2010) (internal quotation mark omitted)). Generally, a court should read a written contract "as a whole," interpreting every part "with reference to the whole" and, where possible, "as to give effect to its general purpose." *Adams v. Suozzi*, 433 F.3d 220, 228 (2d Cir. 2005) (citation and internal quotation marks omitted).

Where the language of a contract is clear or unambiguous, "'words and phrases . . . should be given their plain meaning.'" *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co.*, 564 F.3d 81, 88 (2d Cir. 2009) (alteration in original) (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)). Stated differently, "if a contract is straightforward . . . , its interpretation presents a question of law for the court to be made without resort to extrinsic evidence," in contrast to where a contract's meaning is ambiguous, in which case "the intent of the parties becomes a matter of inquiry, [and] a question of fact is presented which cannot be resolved on a motion for summary judgment." *LaSalle Bank*, 424 F.3d at 205 (quoting *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) (internal quotation marks omitted).

A contract is unambiguous where its terms do not "suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business," *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (citation and internal quotation mark omitted), in contrast to an ambiguous contract, present where the terms of the contract "could suggest more than one meaning" when viewed via the same, objective, reasonably-intelligent-person lens, *SCW West LLC v. Westport Ins. Corp.*, 856 F. Supp. 2d 514, 524 (E.D.N.Y. 2012) (citation and internal quotation marks omitted); *see also JA Apparel Corp. v. Joseph Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (stating that "'[a]mbiguity is determined by looking within the four corners of the document, not to outside sources'" (quoting *Kass v. Kass*, 91 N.Y.2d 554, 566 (2d Dep't 1998))). Notably, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1982); *see also N. Assurance Co. of Am. v. D'Onofrio Gen. Contractors*, No. 08-CV-00976(SJF)(RER), 2009 WL 1437800, at *4 (E.D.N.Y. May 18, 2009) (same).

With this framework in mind, the Court turns to each of plaintiff's breach of contract claims.

### 2. Application

#### a. First Breach of Contract Claim: Employment at Will

Plaintiff claims that defendant breached its employment agreement with her when it terminated her less than two years after she had started working at Ustrive2.

Specifically, plaintiff claims that defendant wrongly terminated her after only seven months, even though (as she claims) the contractual agreement set forth a two year term of employment. (*See* Am. Compl. ¶ 57.) Defendant counters that plaintiff's employment agreement clearly defines her employment as "at will," and that the uncontroverted evidence in the record establishes that plaintiff understood the actual meaning of this phrase, and further, understood that her employment at Ustrive2 would be as an "at will" employee. (*See* Def.'s Mot. for Summ. J. at 10-13.) For the following reasons, the Court agrees with defendant.

At the outset, it is undisputed that plaintiff signed the Ustrive2 Employment Agreement, which expressly describes her employment as "[t]wo years – employment at will by Ustrive2 Inc." (*See* Def.'s Mot. for Summ. J. Ex. D.) Moreover, a review of the supporting documentation reveals that, in her negotiations with Ustrive2, when plaintiff made certain notations upon the proposed employment agreement, she handwrote the phrase "employment at will" at the top of the document (indicating that she understood the employment to be as such), and she did not strike the contract's "employment at will" provision, even though she made notations to have other sections of the agreement removed – like the non-compete provision – removed. (*See* Def.'s Mot. for Summ. J. Ex. C.) The fact that plaintiff signed the finalized agreement, which both incorporated plaintiff's requested edits and included this explicitly stated provision, supports dismissal of plaintiff's breach of contract claim. *See Freiman v. JM Motor Holdings NR 125-139, LLC*, 82 A.D.3d 1154, 1155 (2d Dep't 2011) (reversing lower court's denial of defendants' motion for summary judgment where documentary evidence established plaintiff's written acknowledgements to

being an "at will" employee, and where plaintiff did not deny executing such documents); *see also Melnyk v. Adria Labs, a Div. of Erbamont Inc.*, 799 F. Supp. 301, 307-11 (W.D.N.Y. 1992) (granting defendant's motion for summary judgment on plaintiff's breach of contract claim where plaintiff acknowledged that she was an "at will" employee and where evidence revealed no contractual limitation on defendant's right to discharge plaintiff).

Additionally, "[i]t is [] settled law in New York that, absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party" for any reason or for no reason. *Mycak v. Honeywall, Inc.*, 953 F.2d 798, 801 (2d Cir. 1992) (citation and internal quotation marks omitted); *see also Stamelman v. Fleishman-Hillard, Inc.*, No. 02-Civ-8318(SAS), 2003 WL 21782645, at *4 (S.D.N.Y. July 3, 2003) (stating that "[t]he rule that employment is presumed to be at-will is deeply ingrained in New York law"); *Peterec-Tolino v. Harap*, 68 A.D.3d 1083, 1084 (2d Dep't 2009) (stating that "New York law has long held that 'where an employment is for an indefinite term it is presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even for no reason'" (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 300 (1st Dep't 1983))). This presumption "may be triggered when an employment agreement fails to state a definite period of employment, fix [] employment of a definite duration, establish [] a fixed duration, or is otherwise indefinite." *Rooney v. Tyson*, 91 N.Y.2d 685, 689 (N.Y. App. 1998) (alterations in original) (internal quotation marks omitted).

Examining the express language of the employment agreement, it nowhere states that plaintiff's employment shall be for a

specific or fixed period of time. It simply states: "[t]wo years – employment at will." (Def.'s 56.1 ¶ 26.) Thus, in the absence of any language establishing a fixed or otherwise guaranteed duration of employment, New York's "at will" presumption is triggered. *See Mycak*, 953 F.2d at 801.

Plaintiff argues that the "two years – employment at will" provision cannot be read as establishing an "at will" position because such language is ambiguous. (*See* Pl.'s Opp'n at 2.) As a threshold matter, the Court rejects the notion that the "two year" provision preceding the "at will" language may somehow be read to generate ambiguity as to the "at will" term's actual meaning. Reading the provision as a whole and in context, it is clear that the "two year" language serves as a reference period during which time plaintiff's employment shall be, as expressly stated, "at will." It nowhere represents, however, that plaintiff has a *guaranteed* two years of employment with Ustrive2.

The other provisions in the agreement likewise do not contain any such guarantees as to a fixed period of employment, nor do they suggest that plaintiff's employment should be construed as anything other than "at will." For instance, the salary provision states that plaintiff's yearly rate is $90,000, and that this will be pro-rated and paid "bi-monthly." (*See* Def.'s Mot. for Summ. J. Ex. D.) The provision does not state that this salary is "guaranteed," *i.e.*, payable regardless of whether plaintiff works a full year. Similarly, the stock options provision, addressed in greater detail *infra*, makes plaintiff "*eligible*" to receive stock options "after the initial 90-day transition period," and "after one complete year of service." (*Id.* (emphasis added)) There is no guarantee, however, that plaintiff will receive such options after a certain period of completed time with the Company. (*See id.*); *cf. TSR Consulting Servs. v. Steinhouse*, 267 A.D.2d 25, 27 (1st Dep't 1999) (denying summary judgment to employer where agreement expressly stated that employees would receive "a *guaranteed* non-recoverable draw of $10,000 for [the first year of employment]" and "[f]or the second year of [] employment [] a *guaranteed* recoverable draw of $120,000," the language of which is "consistent with a hiring for a definite period as opposed to an employment-at-will" (emphasis added)).

Thus, a review of the four corners of the Ustrive2 agreement reveals no language suggesting that plaintiff's employment was for a fixed duration or otherwise guaranteed for a two-year period. This is relevant because, as previously set forth, under New York law, where an employment is not clearly one of fixed duration, it will be presumed to be at will. *See Mycak*, 953 F.2d at 801; *Peterec-Tolino*, 68 A.D.3d at 1084. This "at-will presumption [, however,] may be rebutted with proof that the unfettered right to terminate the employment has been limited by express or implied agreement." *In re Vasu*, 129 F. Supp. 2d 113, 117 (D. Conn. 2001) (citing *Rooney*, 91 N.Y.2d at 692); *see also Wright v. Cayan*, 817 F.2d 999, 1003 (2d Cir. 1987) (noting that even if a contract's terms establish indefinite employment, an express limitation on an employer's right to terminate the at-will employee, whether stated in an employer handbook or the like, will control); *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 466 (1982) (noting the rebuttable presumption of at-will employment if no definite term stated in the contract). Even construing the record in plaintiff's favor, it is clear that no express – or even implied – agreement amongst the parties that plaintiff's period of employment was to be anything but that of "at will," nor

does plaintiff direct the Court to any evidence showing the same. *See Wright*, 817 F.2d at 1003-05 (discussing New York case law in which courts have required evidence of a restriction – express or implied – on an employer's ability to discharge an at-will employee in order to overcome the at-will presumption).

Even if the "two years – employment at will" provision may be deemed ambiguous, plaintiff still cannot prevail here because the extrinsic evidence undercuts her position. *See No. Assurance Co. of Am.*, 2009 WL 1437800, at *2 (stating that where a contract's language is ambiguous, the court may consider extrinsic evidence "in the search for the contracting parties' intent" (quoting *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir. 1992)) (internal quotation marks omitted)). Here, a review of such extrinsic evidence plainly reveals that both parties intended for plaintiff's position to be terminable at will by either party at any time.

Specifically, a review of plaintiff's deposition testimony establishes the following: (1) before plaintiff entered into negotiations with Lyons regarding the terms and conditions of her possible employment at Ustrive2, plaintiff was not only familiar with the term, "at-will employment," but clearly understood its meaning, as she was an at-will employee at her prior employment with Protocol (*see* Def.'s 56.1 ¶¶ 11-14, 24 (citing Def.'s Mot. for Summ. J. Ex. B, Pl. Dep., at 87:24 – 88:13, 88:19-22, 170:9-15, 342:13 – 343:15, 343:16-6, 344:7-19, 347:14-23, 378:4-16, 379:4-9)); (2) plaintiff and Lyons engaged in negotiations regarding the terms of plaintiff's employment, including making plaintiff's requested changes to the terms, conditions, and even title of her employment (*see id.* ¶¶ 18-40; *see also* Def.'s Mot. for Summ. J.

Exs. C & D); and (3) plaintiff's prior understanding of "at-will employment" was consistent with the intended meaning of the term as stated in the Ustrive2 agreement, particularly once the non-compete provision was struck from it, per plaintiff's request (*compare* Def.'s 56.1 ¶¶ 11-14 *with id.* ¶¶ 36-40).[8] For these reasons, even if the term "at will employment" may be deemed ambiguous, extrinsic evidence clearly reveals the parties' governing intent, which, most simply stated, was that both parties be able to maintain their freedom regarding plaintiff's continued employment at Ustrive2.[9]

---

[8] Regarding this last point, the Court notes that, in plaintiff's deposition testimony, she states that she requested that the phrase, "two years" be removed from the provision, "employment at will by Ustrive2 Inc." (*See* Def.'s Mot. for Summ. J. Ex. B, Pl. Dep. at 171:3-20, 177:7-23.) However, plaintiff also made clear that this request was made so as to prevent that provision from serving as a type of non-compete, explaining why she also requested that the non-compete clause be stricken from the agreement. (*See id.* at 171:21 – 172:13, 337:11 – 339:16, 345:12 – 346:7.) Thus, even if the "two years" language remaining in the at-will provision, despite plaintiff's request, could be deemed as having created a type of ambiguity, the Court concludes, based on the uncontroverted evidence in the record, that plaintiff not only understood the meaning of "at will employment," but also, understood her employment with Ustrive2 to be the same.

[9] The Court briefly notes that the cases proffered by plaintiff in her opposition memorandum in support of her contention that the Ustrive2 agreement was ambiguous are readily distinguishable. (*See* Pl.'s Opp'n at 2.); *see also Perlick v. Tahari, Ltd.*, 293 A.D.2d 275, 276 (1st Dep't 2002) (affirming trial court's denial of summary judgment to employer where two of employer's writings created ambiguity as to the terms of plaintiff's employment, as there was both a "1997 Deal" and a "1998 Deal," with "[a] guaranteed Draw against Commission . . . to be paid quarterly in the last pay period of each quarter," making it unclear as to whether plaintiff was employed at will or for two one-year periods); *TSR Consulting*, 267 A.D.2d at 27 (affirming denial of summary judgment to employer where agreement

Thus, because the uncontroverted evidence in the record demonstrates that plaintiff was an at-will employee for Ustrive2, and no rational jury could conclude otherwise, the Court grants summary judgment to defendant on plaintiff's first contract claim.

b.      Second Breach of Contract Claim: The Stock Options

Plaintiff also asserts that "Ustrive[2] breached plaintiff's employment contract by failing to provide her with any stock options despite [her] meeting milestone objectives." (Am. Compl. ¶ 60.) Defendant disagrees, arguing that there was no breach because, as plaintiff acknowledges, Ustrive2 offered her the opportunity to exercise her stock options – even offering to accelerate the options' vesting – which she declined. (*See* Def.'s Mot. for Summ. J. at 14; Def.'s Reply at 10.)

The uncontroverted evidence in the record shows that the executed Ustrive2 employment agreement stated that plaintiff would be eligible "to receive 25,000 shares of three-year vesting employee incentive

---

provided guarantees, including "a *guaranteed* non-recoverable draw of $10,000 [for the first year of employment] and "a *guaranteed* recoverable draw of $120,000" for the second year of employment, suggesting agreement was for a definite period as opposed to an employment at will (emphasis added)); *Levey v. A. Leventhal & Sons*, 231 A.D.2d 877, 877 (4th Dep't 1996) (affirming trial court's denial of employer's motion for summary judgment where agreement stated that employee's weekly salary "represents a commission guarantee for the next 15 to 18 months . . . and will act as a 'safety net,'" generating ambiguity as to whether contract was for a definite term or simply "at will"). Here, the record shows only one employment agreement between the parties, which contained no listed guarantees, and which explicitly defined plaintiff's employment as "at will." For these reasons, the Court finds plaintiff's cited cases inapposite to the circumstances presented in this case.

stock options, after the initial 90-day transition period," as well as "an additional 25,000 shares of three-year vesting employee incentive stock options, after one complete year of service," with "[t]he [particular] number of options [to] be released [based] on [plaintiff's meeting certain agreed upon] milestone objectives." (*See* Def.'s Mot. for Summ. J. Ex. D.) At her deposition, plaintiff testified as to her understanding of her stock-option eligibility, confirming that (1) she realized she would not be able to acquire the stock options free of charge, but rather, would have the opportunity to acquire them upon payment of money based on the stock value at that point in time (*see* Def.'s Mot. for Summ. J. Ex. B at 349:19 – 350:19), and (2) none of the stock options that plaintiff acquired during the course of her employment would vest until three years after she had earned them, *i.e.*, she could not cash in on the options until three years after she had acquired them (*see id.* at 186:17 – 189:22). Thus, plaintiff's testimony establishes that plaintiff understood the terms of her stock option eligibility.

Second, it is clear from the uncontroverted evidence in the record that plaintiff did not complete one year of service at Ustrive2. (*See* Def.'s 56.1 ¶ 45 (stating that plaintiff was employed at Ustrive2 from September 15, 2008 to April 24, 2009).) Therefore, under the express terms of the Ustrive2 employment agreement, plaintiff was eligible to receive, at most, "25,000 shares of three-year vesting employee incentive stock options, after the initial 90-day transition period," with the exact amount to be released turning upon whether plaintiff had completed certain designated (and agreed upon) milestone objectives. (*See* Def.'s Mot. for Summ. J. Ex. B.) A review of the record, however, shows that plaintiff and Ustrive2 never

agreed upon any milestone objectives. Specifically, Ustrive2 asserts that no milestones were ever agreed upon. (*See* Def.'s Mot. for Summ. J. at 15.) Notably, plaintiff does not counter this position, nor does plaintiff offer any evidence showing that she satisfied any (unspecified) milestones. Thus, calculation of the stock options available to plaintiff remained undesignated by the parties at the time plaintiff's eligibility was to be assessed.

Any potential confusion generated by the absence of agreed-upon milestones, however, was corrected when Ustrive2's decisionmakers (including Manley, Urion, and Utagawa) reached out to plaintiff to resolve any concerns she had regarding her stock options.

Indeed, even though no milestones were ever set by the parties, Ustrive2 still offered plaintiff the maximum amount of options available to her, 25,000 shares of three-year vesting stock, in light of her less-than-one-year employment status. The record sets forth the following notifications to plaintiff concerning her options. On March 31, 2009, Urion informed plaintiff that she would be awarded 25,000 shares of three-year vesting employee stock options at a strike price that would vest over three years from the date of plaintiff's initial employment with Ustrive2 (specifically, September 15, 2008). (*See* Def.'s 56.1 ¶ 135.) A month later, on April 15, 2009, Manley advised plaintiff that Ustrive2's Board of Directors had agreed to award plaintiff the stock options according to the terms of the employment agreement, *i.e.*, 25,000 shares of three-year vesting stock options. (*Id.* ¶ 136.) On April 24, 2009, Utagawa notified plaintiff that, in consideration for plaintiff's signing the separation and release agreement, Ustrive2 would even provide plaintiff with an *accelerated* vesting of the three-year vesting

stock options. (*Id.* ¶ 137.) Lastly, on May 19, 2009, Manley informed plaintiff that she had 90 days from the effective date of her termination (specifically, April 24, 2009) to exercise her vested stock options. (*Id.* ¶¶ 138-39.) Despite these multiple notifications of available stock options – which even included an opportunity to receive the options at an accelerated rate – plaintiff failed to take any action, essentially choosing not to exercise her vested stock options. Based on plaintiff's inaction, Ustrive2 cancelled plaintiff's stock options.

In sum, the contractual agreement clearly required plaintiff to take action in order for her to receive her stock options. Plaintiff's own testimony confirms that she understood what she was required to do should she decide to exercise her stock options. The uncontroverted evidence in the record also shows the ample notification that plaintiff received, informing her of her right to exercise her stock options. Plaintiff simply failed to do so. Plaintiff's decision not to act where called upon to do so cannot now be construed as defendant's breach. Stated differently, defendant's decision to cancel plaintiff's vested stock options was not a *breach* of the agreement, but a *requirement* arising from plaintiff's failure to take the necessary action on her end.

For these reasons, the Court grants summary judgment to defendant on plaintiff's second breach of contract claim. Ustrive2 cannot be held liable for what plaintiff simply failed to do.

IV. CONCLUSION

For the reasons set forth herein, the Court grants defendant's motion for summary judgment in full and dismisses plaintiff's Amended Complaint in its entirety. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.


_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 10, 2013
        Central Islip, NY


* * *

Plaintiff is proceeding *pro se*, 22 Lisa Drive, Dix Hills, NY 11746. Defendant is represented by Daniel S. Moretti, James M. Woolsey III, and Robert James Anderson of Landman Corsi Ballaine & Ford P.C., 120 Broadway, 27th Floor, New York, NY 10271-0079.